United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NANCY D. RYAN,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　　Defendant. | Case No. 16-CV-00164-LHK<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 61, 62 |

Plaintiff Nancy Ryan ("Plaintiff") sues Defendant United States ("Defendant") for a refund of a $2,214,217.24 tax penalty (the "Penalty") that was imposed on Plaintiff and her late husband, Kevin Ryan ("Mr. Ryan") (collectively, "the Ryans") by the Internal Revenue Service (the "IRS"). Plaintiff and Defendant have each filed a motion for summary judgment. ECF No. 61 ("Pl. Mot."); ECF No. 62 ("Def. Mot."). Having considered the parties' briefing, the relevant law, and the record in this case, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's motion for summary judgment.

## I.　　BACKGROUND

### A. Factual Background

During the year 2000, Mr. Ryan received $37 million in capital gains and sought advice from various financial firms and professionals "on the tax treatment and investment of [these] extraordinary gains." ECF No. 12 ("FAC") ¶ 12. Relying on the advice certain financial institutions, advisors, and accountants, Mr. Ryan purchased what turned out to be a tax shelter called a "Son of Boss" transaction. *Id.* ¶¶ 12–13, 17. This tax shelter was designed to generate noneconomic losses through a series of investments in foreign currency options conducted through single-purpose offshore partnerships. *See* ECF No. 64-1, Exh. 221; *Reddam v. Comm'r*, 755 F.3d 1051 (9th Cir. 2014) (discussing tax shelter's lack of economic substance). As a result, in their tax return for the year 2000, the Ryans reported $36,383,432 in losses that were attributable to the tax shelter, which enabled the Ryans to avoid almost $14 million in taxes. ECF No. 64-1, Exh. 222 line 17; ECF No. 64-2, Exh. 227.

In March 2004, the IRS selected the Ryans' 2000 tax return for audit. *See* FAC ¶ 17; ECF No. 64-2, Exh. 226. At that time, the end of the three-year limitations period for the IRS to assess taxes related to the 2000 tax return was approaching. *See* I.R.C. § 6501(a) (stating that "the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed"). Thus, to allow more time for the audit and possible settlement negotiations, the IRS requested the Ryans to sign a Form 872-I, titled "Consent to Extend the Time to Assess Tax as well as Tax Attributable to Items of a Partnership," which extended the IRS's deadline to assess taxes related to the 2000 tax return to December 31, 2005. ECF No. 64-1, Exh. 223. The Ryans signed the Form 872-I on March 24, 2004. *Id.*

After determining that the Ryans had bought a "Son of Boss" tax shelter, the IRS proposed to (1) assert a deficiency in tax of almost $14 million by disallowing more than $36 million in losses from the tax shelter; and (2) add a 40% accuracy-related penalty under I.R.C. § 6662. *See* FAC ¶¶ 21, 142. In order to resolve the tax dispute without litigation and "avoid" the "threatened imposition of a 40% [accuracy-related] penalty," the Ryans elected to participate in a settlement initiative with the IRS. *Id.* ¶¶ 21, 23; ECF No. 64-2, Exhs. 224–25. The settlement initiative

2

required the Ryans to concede liability for the almost $14 million tax deficiency and to waive their administrative appeal rights. *See* FAC ¶ 21; ECF No. 64-2, Exh. 228 ¶ 12. For its part, the IRS agreed to impose only a 10% accuracy-related penalty and to allow the Ryans to deduct half of their out-of-pocket costs from the "Son of Boss" transaction. *See* FAC ¶¶ 21, 29–31; ECF No. 64-2, Exh. 228 ¶¶ 2, 3, 8. On November 23, 2004, IRS Revenue Agent Susan Luhrs prepared a corrected Form 4549A, titled "Income Tax Examination Changes," to show the Ryans' liabilities resulting from the settlement. ECF No. 64-2, Exh. 227. The Form 4549A showed a tax deficiency of $13,974,201.00 and a corresponding 10% accuracy-related penalty of $1,397,420.10. *Id.* Agent Luhrs also prepared a Form 906 "Closing Agreement on Final Determination Covering Specific Matters," which reflected, inter alia, (1) the IRS's disallowance of a total of $36,383,476.00 in losses for the year 2000; (2) the agreement to allow the Ryans to deduct half of their out-of-pocket costs from the "Son of Boss" transaction; and (3) the agreement to limit the accuracy-related penalty under I.R.C. § 6662 to 10%. ECF No. 64-2, Exh. 228 ¶¶ 2, 3, 8.

The settlement initiative also required the Ryans to either pay their entire tax liability— $13,974,201.00, plus the 10% accuracy-related penalty, plus interest—in one lump sum upon execution of the closing agreement, or "agree to other financial arrangements acceptable to the [IRS] before the [IRS] will execute the closing agreement." ECF No. 64-2, Exh. 224. The Ryans requested an installment agreement from the IRS as an alternative to paying the entire tax all at once. *See* FAC ¶¶ 24–25. The IRS required the Ryans to submit a Form 433-A financial statement so that the IRS could evaluate the Ryans' ability to pay their tax. *See id.* ¶ 25. The Ryans submitted a Form-433-A and a supplemental letter disclosing (1) their unencumbered primary residence, worth $4.5 million; (2) their second home, also unencumbered, worth about $2.0 million; (3) Mr. Ryan's Piper Jaffray account, which contained over $8 million; (4) interest payments due from loans that Mr. Ryan had recently made to Large Scale Biology Corporation ("LSBC"), a company for which Mr. Ryan was serving as Chief Executive Officer ("CEO") at the time; and (5) Mr. Ryan's LSBC salary. ECF No. 64-2, Exh. 229; ECF No. 64-3, Exhs. 230–31.

However, the Ryans did not disclose Mr. Ryan's Rabbi Trust to the IRS.  *See id.*  The Rabbi Trust contained about $13 million in assets, which Mr. Ryan had elected to receive in annual $1 million payments.  ECF No. 64-10, Exh. 266 at 37; ECF No. 64-4, Exh. 248.  The Trust also had a clause that gave the trustee discretion to issue early distributions to Mr. Ryan if he was suffering a "severe financial hardship."  ECF No. 64-4, Exh. 245 at 0174; ECF No. 64-4, Exh. 246 at WF-000375.  Further, the Trust had a "haircut" clause that appeared to give Mr. Ryan the ability to withdraw all his assets at once, at the cost of forfeiting five percent of the assets.  ECF No. 64-4, Exh. 245 at 0176 ("Notwithstanding any other provision of the Plan, a Participant shall be entitled to receive, at any time, upon written request to the Employer, a lump sum distribution equal to 95% of the Participant's account."); *see also* ECF No. 64-4, Exh. 246 at WF-000375 ("The Deferred Payments shall be distributed from the Trust to Ryan . . . (3) in a lump sum payment of up to 100% of the Deferred Amount as elected by Ryan at any time, provided that Ryan shall automatically forfeit 5% of the amount withdrawn.").

The Ryans also failed to disclose their third home, which was located in San Jose and worth about $900,000 in 2006, to the IRS.  *See* ECF No. 64-2, Exh. 229; ECF No. 64-3, Exhs. 230–31; ECF No. 64-11, Exh. 267 at 75.  Although Mr. Ryan retained title to the home, he considered the home to belong to his daughter and son-in-law, the McIlvains.  ECF No. 64-11, Exh. 267 at 75.

Based on the assets that the Ryans had chosen to disclose, the IRS agreed to negotiate an installment agreement.  ECF No. 64-6, Exh. 259 at 39–52.  Specifically, IRS Revenue Officer Marie Maple negotiated an installment agreement with Dennis Haase, the Ryans' tax attorney (who was then employed by Plaintiff's current counsel).  *See* ECF No. 64-12, Exh. 268 at 10–11; ECF No. 63-2, Exh. 212 at US-000156.  In March 2005, Revenue Officer Maple drafted a proposed installment agreement on a Form 433-D stating that the Ryans "agree to pay the federal taxes shown above, PLUS PENALTIES AND INTEREST PROVIDED BY LAW, as follows: $4,000,000 on 04/30/2005 and $175,000.00 on the 20th of each month thereafter until the total

liability is paid in full." ECF No. 64-3, Exh. 232. The proposed installment agreement also provided that monthly payments would increase to $275,000.00 per month on June 20, 2006. *Id.* Further, the "Additional Conditions/Terms" included a payment of "$2,000,000.00+" due on July 15, 2005 to be funded by the sale of the Ryans' second home or "funds from another source." *Id.* Though the proposed installment agreement stipulated that the Ryans would make a $4 million payment on April 30, 2005, Attorney Haase told Revenue Officer Maple on April 8, 2005 that the Ryans did not have enough liquid assets to pay more than $3 million by April 30, 2005. ECF No. 63-2, Exh. 212 at US-000168. Thus, the Ryans and the IRS agreed to reduce the initial $4 million payment in the installment agreement to $3 million, and the Ryans signed the installment agreement on April 12, 2005. ECF No. 64-3, Exh. 232. Thereafter, the Ryans made a $3 million payment to the IRS on April 28, 2005. ECF No. 64-1, Exh. 219 at US-000003.

On May 13, 2005, Revenue Officer Maple's manager recommended approval of the installment agreement. ECF No. 63-2, Exh. 212 at US-000169. Then, on May 19, 2005, the IRS executed the Form 906 closing agreement that had previously been prepared by Agent Luhrs and signed by the Ryans in December 2004. ECF No. 64-2, Exh. 228. The Ryans made their first $175,000 monthly payment in June 2005, as set forth in the installment agreement. ECF No. 64-1, Exh. 219 at US-000003. On July 4, 2005, the IRS formally assessed against the Ryans tax liabilities for the year 2000 consisting of (1) $13,974,201.00 in additional taxes; (2) $2,635,083.45 in interest; and (3) a $1,397,420.10 "IRC 6662 Accuracy Penalty." ECF No. 64-1, Exh. 219 at US-000003. The IRS sent a notice and demand for payment of this tax liability to the Ryans on the same day. *Id.* at US-000017.

However, in March and April of 2005—while the Ryans were negotiating the installment agreement with the IRS, and before the closing agreement was executed—Mr. Ryan also loaned a total of $3.6 million to LSBC. ECF No. 64-5, Exh. 257 at 14. LSBC was in dire straits at the time. Specifically, according to LSBC's Form 10-Q for "the quarterly period ended September 30, 2005," LSBC had "incurred negative operating cash flows of . . . $14,566,000 during the year

5

ended December 31, 2004" and was in the midst of incurring an additional negative operating cash flow of $7,406,000 "during the first nine months of 2005." ECF No. 64-5, Exh. 257 at 10. Thus, LSBC's "history of negative cash flow" raised "substantial doubt about [its] ability to continue as a going concern." *Id.* at 13. Nevertheless, Mr. Ryan believed that if LSBC could survive long enough, he could persuade another company to take it over, which would generate a high payout for him. *See* ECF No. 64-11 at 44. Thereafter, in May 2005, Mr. Ryan's Piper Jaffray financial advisor, Richard Judd, told him that his Piper Jaffray account—in which Mr. Ryan had deposited most of the $35 million in capital gains he had received in 2000—was nearly out of cash. ECF No. 64-8, Exh. 263 at 105. Judd prepared a history of all the withdrawals that Mr. Ryan had made from the Piper Jaffray account. *Id.* at 15; ECF No. 64-5, Exh. 250 at 67–68. This history showed that after March 2004—which is when the IRS first contacted Mr. Ryan about auditing his 2000 tax return—in addition to the $3 million that eventually went to the IRS in April 2005, Mr. Ryan had withdrawn $9,794,349 from his account. *See* ECF No. 64-5, Exh. 250 at 67–68; ECF 64-5, Exh. 251. At least $3.6 million of that amount went to LSBC; the rest went to other investments. ECF No. 64-8, Exh. 263 at 111 (deposition testimony of Richard Judd stating that Mr. Ryan "just had invested, let's say, or lent far more than he realized").

Thereafter, on July 15, 2005, the Ryans failed to make the $2 million payment that was due on that date under the installment plan. FAC ¶ 34. The Ryans had discovered earlier that month that their second home—which they had planned to sell in order to make the $2 million payment—was contaminated by mold from an undetected water leak and was thus not ready to be sold at that time. ECF No. 63-13, Exh. 270 at 19. As a result, on July 20, 2005, Attorney Haase sent a letter to Revenue Officer Maple stating that the Ryans were seeking to borrow $2 million against their second home because that would be a quicker way of securing the $2 million for the overdue July 15 payment. ECF No. 64-3, Exh. 233. Meanwhile, on August 5, 2005, Mr. Ryan loaned LSBC another $750,000. ECF No. 64-5, Exh. 257 at 7.

On September 9, 2005, Haase wrote to Revenue Officer Maple to report that there was

United States District Court
Northern District of California

"just one outstanding lien" on the Ryans' second home, and that the Ryans were "getting the payoff information and all required paperwork to extinguish the lien" so that the Ryans could obtain a home equity loan on their second home "to pay the past due $2 million lump sum amount." ECF No. 64-3, Exh. 234. On the same day, Revenue Officer Maple warned Haase that in light of the fact that the $2 million payment was due on July 15, 2005, she could not "continue to hold [the payment] in abeyance" and that she "may be sending it out to local collections office." ECF No. 63-2, Exh. 212 at US-000175. Upon Haase's representation that Mr. Ryan was not experiencing financial difficulties and that "it[] [was] just a matter of time to get the paperwork straightened out for the loan," Revenue Officer Maple told Haase that she would "hold" until September 16, 2005, and that if Haase did not call her with a status update on September 16, she would "take additional collection action." *Id.*

However, by September 28, 2005, Revenue Officer Maple had still received no word from Haase or the Ryans, and the $2 million payment remained unpaid. *Id.* at US-000177. Thus, Maple issued a Notice of "Defaulted Installment Agreement Under IRC 6159(b)" and "Intent to Levy Under IRC 6331(d)" to the Ryans. ECF No. 64-3, Exh. 235. This Notice stated that the Ryans were not meeting the terms of the installment agreement because they had "[f]ailed to pay Installment Agreement when due under terms of the agreement." *Id.* The Notice also stated that the IRS intended to terminate the installment agreement and collect the entire amount of the Ryans' tax liability if the Ryans did not meet all of the conditions of the agreement. *Id.* Further, the Notice notified the Ryans that "[t]o prevent this action, you must contact [Revenue Officer Maple] within 30 days of this notice," and warned that "[i]f you do not contact us within 30 days of the date of this notice, your installment agreement will be terminated." *Id.*

On October 20, 2005, Attorney Haase wrote to Revenue Officer Maple to notify her that Mr. Ryan had "removed the last lien off his California property in order to qualify for the $2 million home equity line of credit," and that "[s]hortly, Mr. Ryan will forward to our office the funds necessary to pay the $2 million lump sum payment due to the IRS and to continue the

installment arrangement." ECF No. 64-3, Exh. 236. However, by November 4, 2005, the $2 million payment remained unpaid. Thus, on that date, Revenue Officer Maple recorded a Form 668(Y)(c) "Notice of Federal Tax Lien" ("NFTL") in Santa Clara County, where the Ryans' real property was located. ECF No. 64-3, Exh. 238. The NFTL included a demand for the "Unpaid Balance" of the tax assessed on July 4, 2005, which amounted to $14,533,593.76, as well as "additional penalties, interest, and costs that may accrue." *Id.*

On November 3, 2005, Mr. Ryan asked the trustee of his Rabbi Trust, Wachovia Bank, for an early distribution of the assets in the Trust (which was roughly $12 million at the time, *see* ECF No. 64-5, Exh. 249), pursuant to the "severe financial hardship" clause. ECF No. 64-5, Exh. 252. Wachovia denied Mr. Ryan's request, and added that it had "also considered whether a distribution could be made through other means," but had concluded that "the wording of the documents precludes other methods after the Payment Designation is made." ECF No. 64-5, Exh. 253. Neither Mr. Ryan nor his counsel attempted to invoke the "haircut clause." ECF No. 64-9, Exh. 265 at 30–31, 52; ECF No. 64-12, Exh. 268 at 132 (deposition testimony of Attorney Haase stating that "we weren't familiar with the haircut clause").

Meanwhile, also in the fall of 2005, LSBC defaulted on the monthly interest payments on the loans that Mr. Ryan had given to LSBC, and also stopped paying Mr. Ryan's salary. FAC ¶ 71. Nevertheless, on November 22, 2005, Mr. Ryan made another loan to LSBC in the amount of $340,000. ECF No. 64-5, Exh. 256. LSBC never repaid Mr. Ryan's loans and declared bankruptcy in January 2006. ECF No. 64-5, Exh. 254; ECF No. 64-13 Exh. 270 at 22. Its assets were liquidated, and Mr. Ryan recovered nothing from the liquidation. ECF No. 64-5, Exh. 254.

On December 12, 2005, Attorney Haase called Revenue Officer Maple and left a voice message stating that the Ryans had obtained a commitment from a lender for a $2 million loan secured by the equity in the Ryans' principal residence, which had been formally appraised to have a fair market value of $4.5 million. FAC §§ 45, 48; ECF No. 64-3, Exh. 241; ECF No. 63-2, Exh. 212 at US-000179. However, the Ryans could obtain this $2 million loan only if the IRS

agreed to subordinate its lien on the Ryans' principal residence to the lender's lien. *See* ECF No. 63-2, Exh. 212 at US-000179. In response, Revenue Officer Maple sent Attorney Haase written instructions for submitting a lien subordination application. ECF No. 64-3, Exh. 239.

On January 17, 2006, Revenue Officer Maple put in a request to transfer the Ryans' account to an IRS Collection Group in California in light of the Ryans' default on the installment agreement. ECF No. 63-2, Exh. 212 at US-000180–81; *see* ECF No. 64-7, Exh. 260 at 79–80. On February 2, 2006, the Ryans' account was assigned to Revenue Officer David Palmer. ECF No. 63-2, Exh. 212 at US-000183. Meanwhile, Attorney Haase prepared the Ryans' lien subordination application and submitted it to the IRS Boston Lien Unit—as Revenue Officer Maple had instructed—on January 18, 2006. ECF No. 64-3, Exh. 241. Attorney Haase then re-submitted the application to the IRS Lien Unit in Oakland, California on January 27, 2006, ECF No. 64-3, Exh. 242, and sent a copy of the application directly to Revenue Officer Palmer on March 21, 2006. ECF No. 63-3, Exh. 213.

On April 6, 2006, Revenue Officer Palmer reviewed the Ryans' lien subordination application and determined that it was "complete and proper as outlined in [IRS] Pub 784." ECF No. 63-2, Exh. 212 at US-000191. Palmer thus sent the application to his supervisor, Group Manager Douglas Hall, for review. *Id.* Upon his review of the Ryans' lien subordination application, Group Manager Hall determined that, absent more information from the Ryans and their lender about why the Ryans were proposing to borrow only $2 million against a property valued at $4.5 million, he could not render a recommendation about whether the application should be granted. ECF No. 63-2, Exh. 212 at US-000191. Thus, Hall instructed Revenue Officer Palmer to contact Attorney Haase to "discuss the reasons for the [$]2,500,000.00 difference." *Id.* Accordingly, Palmer told Haase on April 6, 2006 that the IRS needed to know "the maximum amount available in equity" on the $4.5 million property (meaning the maximum amount that the Ryans' lender was willing to lend against the property), as well as other updated financial information, in order for Palmer and Hall to finish processing and evaluating the Ryans'

application. *Id.* Haase said that he would find out this maximum amount and report back to Palmer. *Id.*

However, information about the Ryans' maximum borrowing amount was never sent to Revenue Officer Palmer or anyone at the IRS. *See* ECF No. 64-13, Answer to RFA 93. As a result, Palmer never sent the Ryans' lien subordination application to be formally approved or rejected. On May 11, 2006, Palmer faxed Haase a notice warning that the IRS would begin taking "enforced collections actions such as Notices of Levy or Seizure of property" if the Ryans failed to provide the IRS with updated financial information, including "[d]ocumentation from lender showing maximum amount of loan available," by May 19, 2006. ECF No. 63-3, Exh. 215. In addition to never sending the information about their maximum borrowing amount, the Ryans also failed to timely produce the other updated financial information requested by the IRS. *See* ECF No. 63-3, Exh. 216 (dated "May 25, 2006"). As a result, on May 24, 2006, Revenue Officer Palmer began levying on the Ryans' property. ECF No. 63-2, Exh. 212 at US-000193; *see* FAC ¶ 69.

Shortly thereafter, on June 23, 2006, Mr. Ryan transferred legal title to the Ryans' third home to his daughter and son-in-law, the McIlvains, in return for a promissory note that did not require any payments until September 2011. ECF No. 63 ¶ 30; *see United States v. Ryan*, 2011 WL 1344499, at *2 (N.D. Cal. Apr. 8, 2011) ("The IRS was unable to levy upon one parcel of real property owned by the Ryans at the time they incurred the tax liability because the Ryans transferred the property to their daughter in 2006 in return for a promissory note that does not require any payments until September 2011."). As discussed above, during the Ryans' installment agreement negotiations with the IRS in 2005, the Ryans did not disclose their ownership of this third home, which was worth about $900,000 when Mr. Ryan made the transfer. ECF No. 64-2, Exh. 229; ECF No. 64-3, Exhs. 230–31; ECF No. 64-11, Exh. 267 at 75; *see Ryan*, 2011 WL 1344499, at *2 (stating that the Ryans "concealed the 2006 transfer of real property to their daughter").

10

In the spring of 2007, Revenue Officer Palmer obtained a writ of entry and seized the Ryans' cars, two late-model Jaguar sedans and a 1957 Ford Thunderbird. ECF No. 63 ¶ 25. Then, on September 30, 2007, the Ryans sold their refurbished second home for $2.7 million. FAC ¶ 79. Because of the IRS's tax lien on the Ryans' real property, the net proceeds of this sale went directly to the IRS. *Id.*

On October 1, 2007, the IRS assessed the $2,214,217.74 Penalty at issue in this case against the Ryans. FAC ¶ 80; ECF No. 63 ¶ 31. On the Ryans' behalf, Attorney Haase protested the Penalty in an April 17, 2008 letter to Revenue Officer Palmer, and again in a July 28, 2008 follow-up letter to Group Manager Hall. FAC ¶ 89. Palmer and Hall responded that the Penalty was proper and enforceable. FAC ¶¶ 90–91. Because the Ryans were still far from fully paying their outstanding tax liabilities, the IRS's enforced collection activity continued. ECF No. 63 ¶ 3.

In 2008, the IRS determined that it was necessary to levy the Ryans' principal residence in order to facilitate collection of the Ryans' sizable outstanding tax liability. *See id.* ¶ 33. Thus, on October 22, 2008, the United States filed a petition for judicial approval of the levy under I.R.C. § 6334(e) in this District. *Id.* That action was assigned to Judge Jeremy Fogel. *See Ryan*, 2011 WL 1344499. In its levy petition, the United States asserted "an unpaid balance of $11,747,231.80, which included unpaid principal in the amount of $8,793,147.92 and penalties and interest in the amount of $2,954,083.88." *Id.* at *1. However, in December 2008, Mr. Ryan again requested the trustee of his Rabbi Trust to grant him an early distribution of the assets remaining in the Trust, which at that time amounted to $5.9 million, under the "severe financial hardship" clause. ECF No. 64-5, Exh. 254. The trustee granted Mr. Ryan's request in February 2009, and those funds were paid over to the IRS. *See* ECF No. 64-5, Exh. 255; ECF No. 64-1, Exh. 219. Nevertheless, even with this payment, the Ryans' "outstanding balance as of July 23, 2009 was $6,233,769." *Ryan*, 2011 WL 1344499 at *1.

Thus, on April 8, 2011, Judge Fogel granted the United States' petition to levy the Ryans' primary residence. *See id.* Judge Fogel concluded that the Ryans had not sufficiently

11

demonstrated that they had assets other than their primary residence from which their tax liabilities could be satisfied. *Id.* at *2. Further, Judge Fogel noted that although "equity" could "play[] no part" in his decision, "the Ryans would not prevail" even "if equitable considerations were to play a part in" his analysis because "the Ryans ha[d] not made a voluntary payment since 2006; they concealed the 2006 transfer of real property to their daughter; and despite their asserted ability to satisfy their tax liability, they ha[d] not done so in the two and a half years since" the United States filed its levy petition. *Id.* at *2.

Thereafter, the IRS allowed the Ryans to list their primary residence for sale, which brought $3.8 million in July 2012. ECF No. 63 ¶ 35. The net proceeds of the sale went directly to the IRS. *Id.* Eventually, the Ryans satisfied their remaining tax obligations—including the Penalty—in October 2012. *Id.*; FAC ¶ 98.

### B. Procedural History

On July 1, 2013, the Ryans submitted a Form 843 Request for Refund to the IRS seeking recovery of the Penalty. FAC ¶ 98. The IRS denied the Ryans' claim on January 13, 2014. *Id.* ¶ 99. The Ryans' subsequent requests for reconsideration and appeal were also unsuccessful. *See id.* ¶¶ 105, 112. Thereafter, Mr. Ryan passed away in September 2015. *Id.* ¶ 1.

Plaintiff filed the instant action on January 11, 2016. *See* ECF No. 1. Plaintiff then filed an amended complaint on March 30, 2016, *see* FAC, and Defendant answered Plaintiff's amended complaint on June 2, 2016. ECF No. 14.

On December 15, 2016, Plaintiff moved for leave to file a second amended complaint. ECF No. 27. Defendant opposed Plaintiff's motion on December 29, 2016, ECF No. 29, and Plaintiff filed a reply on January 5, 2017. ECF No. 31. On March 6, 2017, the Court denied Plaintiff's motion for leave to file a second amended complaint. ECF No. 42.

On February 14, 2018, Plaintiff and Defendant each filed a motion for summary judgment. Pl. Mot.; Def. Mot. Oppositions were filed on February 28, 2018, ECF No. 65 ("Def. Opp."); ECF No. 66 ("Pl. Opp."), and replies were filed on March 7, 2018. ECF No. 28 ("Def. Reply");

Case No. 16-CV-00164-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ECF No. 69 ("Pl. Reply").

**II.     LEGAL STANDARD**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

**III.    DISCUSSION**

Plaintiff's action seeks a refund of the $2,214,217.24 Penalty. Thus, in her amended complaint, Plaintiff argues that she is entitled to a refund of the Penalty based on the following seven causes of action: (1) abuse of discretion (Count One); (2) breach of an implied covenant of good faith and fair dealing (Count Two); (3) failure to provide adequate notice of the Penalty (Count Three); (4) abatement of the Penalty for reasonable cause and absence of willful neglect

pursuant to I.R.C. § 6651(a)(3) (Count Four); (5) the closing agreement barred the Penalty (Count Five); (6) abatement of the Penalty pursuant to the Internal Revenue Manual (Count Six); and (7) the Form 872-I barred the Penalty (Count Seven). *See* FAC.

Defendant moves for summary judgment on all seven counts, *see* Def. Mot., while Plaintiff moves for summary judgment on all counts except Count Six. *See* Pl. Mot. Because Counts One, Two, and Four are "interrelated," Pl. Reply at 11, the Court first addresses each of those counts in turn. Then, the Court addresses Counts Three, Five, Six, and Seven in turn.

### A. Count One

In Count One, Plaintiff argues that she is entitled to a refund of the Penalty because the IRS abused its discretion by failing to grant the Ryans' lien subordination application. *See* FAC ¶¶ 114–18. As discussed above, by December 12, 2005, the Ryans had obtained a commitment from a lender for a $2 million loan secured by the equity in the Ryans' principal residence, which had been formally appraised to have a fair market value of $4.5 million. FAC §§ 45, 48; ECF No. 64-3, Exh. 241; ECF No. 63-2, Exh. 212 at US-000179. However, the Ryans could obtain this $2 million loan only if the IRS agreed to subordinate its lien on the Ryans' principal residence— which had been recorded by the IRS on November 4, 2005 pursuant to I.R.C. § 6323(f), *see* ECF No. 64-3, Exh. 238—to the lender's lien. *See* ECF No. 63-2, Exh. 212 at US-000179. Thus, the Ryans filed an application with the IRS requesting lien subordination and stating that they intended to pay all proceeds of the $2 million loan to the IRS. *See* ECF No. 64-3, Exh. 241. The IRS never approved the Ryans' lien subordination application.

Plaintiff's theory in Count One appears to be that (1) the IRS's failure to approve the Ryans' lien subordination application was an abuse of discretion; and (2) Plaintiff is entitled to a refund of the entire Penalty based on the IRS's abuse of discretion because if the IRS had taken the correct course of action and granted the Ryan's application, the Ryans would have been able to "avoid[] . . . default[ing] on the installment agreement and the eventual penalty." FAC ¶ 118. For the reasons explained below, the Court finds that Plaintiff has failed to provide sufficient evidence

for a reasonable trier of fact to find in favor of Plaintiff on Count One.

As an initial matter, even if the IRS's failure to approve the Ryans' lien subordination application was an abuse of discretion, it is far from clear that this abuse of discretion would entitle Plaintiff to a refund of the Penalty. This is because Plaintiff has not submitted any evidence that supports her contention that the Ryans would have been able to "avoid[] . . . default[ing] on the installment agreement and the eventual penalty" if the IRS had approved their application. FAC ¶ 118. First, with regards to defaulting on the installment agreement, the Ryans had already defaulted on the installment agreement several months *before* they even submitted their application for lien subordination. It is undisputed that (1) under the Installment Agreement, the Ryans were obligated to make a $2 million payment to the IRS by July 15, 2005; (2) the Ryans failed to make that $2 million payment by July 15, 2005, *see* FAC ¶ 34; (3) as a result, Revenue Officer Maple issued a "Notice of Defaulted Installment Agreement and Notice of Intent to Levy" on September 28, 2005, ECF No. 64-3, Exh. 235; and (4) the Ryans' failure to cure the default prompted Revenue Officer Maple to record a Notice of Federal Tax Lien on November 4, 2005 in Santa Clara County, where the Ryans' primary residence was located. ECF No. 64-3, Exh. 238. However, the Ryans first submitted their application for lien subordination to the IRS on January 16, 2006. ECF No. 64-3, Exh. 241. Thus, because the Ryans undisputedly defaulted on their installment agreement before even submitting their lien subordination application, any eventual approval of the Ryans' lien subordination application could not have possibly helped the Ryans avoid defaulting on the installment agreement. Indeed, the Ryans' default and subsequent failure to cure that default are what prompted the IRS to record a lien on the Ryans' primary residence in the first place, and thus it makes no sense for Plaintiff to assert that the IRS's failure to subordinate its lien vitiated the Ryans' ability to avoid defaulting on the installment agreement.

Second, and more importantly, there is no support in the record for Plaintiff's assertion that if the IRS had approved the Ryans' lien subordination application, the Ryans would have been able to "avoid[]" the Penalty. FAC ¶ 118. The parties do not dispute that the $2,214,217.74

United States District Court
Northern District of California

Penalty in the instant case was a "failure-to-pay" penalty that was imposed on the Ryans pursuant to I.R.C. § 6651(a)(3). *See* Pl. Mot. at 1; Def. Mot. at 14. Section 6651(a)(3) imposes a penalty on any taxpayer who fails "to pay any amount in respect of any tax required to be shown on a return . . . which is not so shown" within "10 business days" after the IRS issues a "notice and demand" for payment of the tax, if the tax demanded is greater than $100,000. The size of the penalty is 0.5 percent of the portion of the tax that the taxpayer has not yet paid "if the failure [to pay] is for not more than 1 month, with an additional 0.5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate." I.R.C. § 6651(a)(3). However, the monthly rate increases to 1.0 percent if the IRS serves levies to collect the tax. *Id.* § 6651(d)(2). On the other hand, the monthly rate decreases to 0.25 percent if an installment agreement is in effect. *Id.* § 6651(h). In any event, a § 6651(a)(3) failure-to-pay penalty starts to accrue 10 business days after the IRS's notice and demand is issued, and increases each month until either the taxpayer pays the entire tax or the penalty reaches 25 percent of the entire tax, whichever comes first.

In the instant case, the Penalty started accruing on July 18, 2005—10 business days after the IRS issued a notice and demand for payment of taxes on July 4, 2005. *See* ECF No. 64-1, Exh. 219 at US-000017 ("07-04-2005 Statutory Notice of Balance Due" listed on the "Form 4340" "Certificate of Assessments, Payments, and Other Specified Matters" for "Kevin J & Nancy Ryan"); *E.J. Harrison & Sons, Inc. v. C.I.R.*, 2011 WL 2636263, at *3 n.5 (T.C. July 5, 2011) ("A Statutory Notice of Balance Due entry on Form 4340 is sufficient to presumptively establish that notice and demand was sent on the date corresponding to the Statutory Notice of Balance Due entry."). According to Defendant's calculation of the Penalty, the accuracy of which Plaintiff does not dispute, by January 18, 2006—two days after the Ryans submitted their lien subordination application—the Ryans had already incurred $461,564.44 of the $2,214,217.74 Penalty. *See* ECF No. 64-1, Exh. 220. Thus, in light of the fact that the Ryans had already incurred a substantial portion of the Penalty before even submitting a lien subordination application, Plaintiff's

16

contention that the Ryans would have been able to avoid incurring the *entire* Penalty altogether if the IRS had approved their lien subordination application is meritless. Further, again according to Defendant's calculation of the Penalty, when the Ryans submitted their lien subordination application in January 2006, they owed over $10 million to the IRS in unpaid taxes, excluding interest. *See* ECF No. 64-1, Exh. 220. Thus, even if the IRS had approved the Ryans' lien subordination application in January 2006, thereby enabling the Ryans to obtain the $2 million loan and apply all of the proceeds to their tax liability, the Ryans would still have owed over $8 million in unpaid taxes, excluding interest. As a result, under I.R.C. § 6651(a)(3), the Penalty would have continued to accrue each month. In other words, Plaintiff offers no evidence to suggest that the Ryans' desired lien subordination would have enabled them to stop the Penalty from further accruing. Accordingly, even assuming that the IRS's failure to approve the Ryans' lien subordination application was an abuse of discretion, there is little reason to think that Plaintiff would be entitled to a refund of the Penalty based on that abuse of discretion.

In any event, the Court finds that Plaintiff has not submitted sufficient evidence for a reasonable trier of fact to conclude that the IRS abused its discretion by failing to approve the Ryans' lien subordination application. The IRS's ability to subordinate its liens on delinquent taxpayers' property is governed by I.R.C. § 6325(d) and 26 C.F.R. § 301.6325-1(d). I.R.C. § 6325(d) states that the IRS "may issue a certificate of subordination of any lien" if, inter alia, the IRS "believes that the amount realizable by the United States from the property to which the certificate relates, or from any other property subject to the lien, will ultimately be increased by reason of the issuance of such certificate and that the ultimate collection of the tax liability will be facilitated by such subordination." 26 C.F.R. § 301.6325-1(d) emphasizes that the IRS has "discretion" in making its subordination decisions, and lists three examples illustrating situations in which the IRS could, "in [its] discretion," subordinate its lien in order "[t]o facilitate tax collection."

Based on the text of I.R.C. § 6325(d) and 26 C.F.R. § 301.6325-1(d), courts have

United States District Court
Northern District of California

recognized that the IRS has considerable discretion in deciding whether to grant a taxpayer's request for lien subordination. *See Behr v. United States*, 2010 WL 1131383, at *18 (D. Minn. 2010) ("On the plain reading of [I.R.C. § 6325(d)] and [26 C.F.R. § 301.6325-1(d)(2)], as with a discharge of property, subordination is within the Secretary's discretion."); *Sandberg v. C.I.R.*, 2011 WL 1135720, at *6 (T.C. Mar. 28, 2011) ("The IRS can issue a certificate of subordination, which subordinates the tax lien on specific property. But doing so is not a ministerial act: it involves judgment and discretion." (citing I.R.C. § 6325(d) and 26 C.F.R. § 301.6325-1(d)(1)). Indeed, the United States Tax Court has even stated that because lien subordination, "as expressed in" the relevant statute and regulation, is "permissive," the IRS "is generally not required to . . . subordinate . . . *even if the conditions [for subordination] are fully met.*" *Morris v. C.I.R.*, 2016 WL 695385, at *7 (T.C. Feb. 4, 2016) (emphasis added); *accord Green v. C.I.R.*, 2014 WL 4337019, at *3 (T.C. Sep. 2, 2014) (emphasis added). Under this expansive view of the IRS's discretion, even if the "conditions [for subordination were] fully met" in the instant case, the IRS was still not "required to" approve the Ryans' lien subordination application, and thus the IRS's failure to approve the application cannot be deemed an abuse of discretion.[1] *Id.*

Further, even under a less expansive view of the IRS's discretion, Plaintiff has not offered sufficient evidence for a reasonable trier of fact to conclude that the IRS abused that discretion by failing to approve the Ryans' lien subordination application. Once again, the governing regulation states that the IRS "may, in [its] discretion, issue a certification of subordination of a lien" if it

---

[1] Plaintiff's reliance on *Alessio Azzari, Inc. v. C.I.R.*, 136 T.C. 178 (2011), is inapposite. In *Azzari*, an IRS settlement officer refused to consider a request for the IRS to subordinate its lien to a creditor's security interest because the officer had erroneously determined that the IRS's lien "was already junior to the security interest held by" that creditor. *Id.* at 185. Thus, the officer "did not reach" the discretionary determination "of whether subordinating the Federal tax lien would facilitate collection." *Id.* The Tax Court emphasized that the IRS "has discretion under [I.R.C. §] 6325(d) to determine whether it is in the Government's interest to subordinate a Federal tax lien," but observed that the officer's "refusal to consider petitioner's request to subordinate the lien was based on an error of law," and not on any discretionary determinations. *Id.* at 191. Thus, the Tax Court held that "[t]o the extent it was based upon an error of law, [the officer's] determination constitutes an abuse of discretion." *Id.* In the instant case, Plaintiff does not assert, and offers no evidence to show, that the IRS's failure to approve the Ryans' lien subordination application was based on any analogous errors of law as opposed to discretionary determinations.

Case No. 16-CV-00164-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

"believes that the subordination of the lien will ultimately result in an increase in the amount realized by the United States from the property subject to the lien and will facilitate the ultimate collection of tax liability." 26 C.F.R. § 301.6325-1(d)(2). Accordingly, the Internal Revenue Manual ("IRM") states that "[g]enerally, subordinations are issued only when it is in the best interest of the government." IRM 5.12.10.6.3.1. Further, the IRM instructs that because there is always "a risk that [a] subordination will decrease collection," the IRS "must exercise good judgment in weighing the risks and deciding whether to subordinate the federal tax lien." IRM 5.17.2.8.6.4. The IRS's "judgment" must be "similar to the decision that an ordinarily prudent business person would make in deciding whether to subordinate his/her rights in a debtor's property in order to secure additional long run benefits." *Id.*

Defendant has submitted evidence indicating that approving the Ryans' lien subordination "would not have been in the IRS's best interest," Def. Mot. at 20, and therefore would have fallen short of the "ordinarily prudent business person" standard. IRM 5.17.2.8.6.4. Specifically, Defendant points to the low loan-to-value ratio proposed by the Ryans in their lien subordination application. As discussed above, in their application, the Ryans proposed to borrow only $2 million against a property that was valued at $4.5 million—which amounts to a 44 percent loan-to-value ratio. FAC §§ 45, 48; ECF No. 64-3, Exh. 241; ECF No. 63-2, Exh. 212 at US-000179. In contrast, IRS Group Manager Douglas Hall, who had processed many lien subordination applications as an IRS employee, testified that "under general guidelines, you would expect to see something in the neighborhood of a loan equal to 80 percent of the [property] value" in successful lien subordination applications. ECF No. 64-7, Exh. 260 at 75. In any event, when presented with the Ryans' lien subordination application, the IRS had to decide whether subordinating its lien over *the entire $4.5 million property* in exchange for $2 million in loan proceeds was likely to "ultimately result in an increase in the amount realized by the United States from the property subject to the lien." 26 C.F.R. § 301.6325-1(d)(2). Under these circumstances, given the low loan-to-value ratio, it would be difficult to fault "an ordinarily prudent business person" for

believing that maintaining a superior lien over the $4.5 million property, instead of subordinating that lien in exchange for $2 million, would ultimately be the revenue-maximizing option. IRM 5.17.2.8.6.4. Bolstering this notion is the fact that by maintaining its superior lien over the property, the IRS was eventually able to extract $3.8 million of value out of the property by levying it and forcing a sale. ECF No. 63 ¶ 35. For her part, Plaintiff offers no evidence or reasons to suggest that it would have been *outside the bounds of the IRS's discretion* to determine that subordinating the lien over the Ryans' primary residence in these circumstances was contrary to the government's interest.

Finally, and perhaps most importantly, Plaintiff has failed to raise a dispute of material fact regarding whether the IRS abused its discretion because the record demonstrates that what ultimately caused the IRS to fail to act upon the Ryans' lien subordination application was the Ryans' undisputed failure to comply with the IRS's request for additional information that it deemed necessary for purposes of making a formal decision on the Ryans' application. As Plaintiff acknowledges, the IRS never formally granted or rejected the Ryans' lien subordination application. *See* Pl. Opp. at 17 (asserting that the application "was never processed or acted on" and was instead "de facto reject[ed]"). Instead, while supervising the processing of the Ryans' application, Revenue Officer Group Manager Hall determined that, absent more information from the Ryans and their lender about why the Ryans were proposing to borrow only $2 million against their $4.5 million property, he could not render a recommendation about whether their application should be granted. ECF No. 63-2, Exh. 212 at US-000191. Thus, Hall instructed Revenue Officer Palmer to contact Attorney Haase to "discuss the reasons for the [$]2,500,000.00 difference," and in turn Palmer told Haase that the IRS needed to know "the maximum amount available in equity" on the $4.5 million property (meaning the maximum amount that the Ryans' lender was willing to lend against the property) in order for Palmer and Hall to finish processing and evaluating the Ryans' application. *Id.* However, the Ryans *never* provided that information to the IRS.

Plaintiff does not dispute that this information was never provided to the IRS. Instead,

Plaintiff states that the Ryans "did not supply the maximum loan information because" their former mortgage broker, Scott MacClure, left the mortgage brokerage firm in February 2006 and thus "was not available to provide that information." Pl. Opp. at 7. This does not excuse the Ryans' failure to provide the necessary information to the IRS.

In light of the Ryans' failure to provide information that the IRS had requested and deemed necessary to evaluate their lien subordination application, no reasonable trier of fact could find that the IRS's failure to act upon the application was an abuse of discretion. Indeed, the IRS is at liberty to "require" any lien subordination "applicant to furnish such additional information" as the IRS "may deem necessary," Rev. Proc. 68-8 § 6, and Plaintiff provides no evidence or legal basis to suggest that the IRS was required to process and approve the Ryans' lien subordination application despite the Ryans' failure "to furnish [the] additional information" that the IRS had "deem[ed] necessary." *Id.*

Plaintiff attempts to make a related argument that the IRS abused its discretion by "mishandling" the Ryans' lien subordination application, and appears to argue that this "mishandling" is what caused the IRS to fail to act on the Ryans' application. Pl. Mot. at 21. Specifically, Plaintiff points out that neither Revenue Officer Palmer nor Group Manager Hall had authority to approve or reject the Ryans' lien subordination application because only "the IRS Technical Services office" could approve or reject such applications. Pl. Mot. at 20. Based on this, Plaintiff argues that Revenue Officer Palmer mishandled and improperly interfered with the Ryans' application because he failed to send the application to the "San Jose Technical Services office," thereby ensuring that the application was never "reviewed by or acted upon by" any Technical Services office. *Id.* Defendant does not dispute that the Ryans' lien subordination application was never sent to a Technical Services office for formal approval or rejection.

However, Plaintiff offers no legal or factual basis to suggest that Revenue Officer Palmer or any other IRS employee mishandled the Ryans' lien subordination application. Even though Palmer, as a Revenue Officer, was not authorized to formally reject the Ryans' lien subordination

United States District Court
Northern District of California

application, *see Kugler v. United States*, 2000 WL 1274230, at *3 (W.D. Pa. July 10, 2000)

(stating that 26 C.F.R. § 301.6325-1(d) "does not permit a revenue officer to deny a written

application for a certificate of subordination"), Plaintiff acknowledges that the Ryans' application

was never formally rejected by anyone. *See* Pl. Opp. at 17 (asserting that the application "was

never processed or acted on" and was instead "de facto reject[ed]"). Further, Plaintiff recognizes

that as a Revenue Officer, Palmer had a duty "to verify [the] completeness" of the Ryans'

application, Pl. Mot. at 21, and to render a recommendation about whether to grant the application.

Pl. Opp. at 16; *see Kugler*, 2000 WL 1274230 at *3 (stating that a revenue officer did not act

beyond his authority by recommending against granting a lien subordination application). That

appears to be exactly what Palmer tried to do. As explained above, after discussing the Ryans'

lien subordination application with his supervisor, Group Manager Hall, Palmer told the Ryans'

attorney that the IRS needed more information about the proposed loan in order to process and

evaluate the Ryans' application. However, as discussed above, the Ryans never submitted that

information to the IRS. In light of the Ryans' failure to comply with the IRS's request for

additional information, it is difficult to see how Palmer erred by not sending the Ryans'

application to a Technical Services office for a formal decision. Put another way, Plaintiff offers

no legal or factual basis to suggest that Revenue Officer Palmer was *legally obligated* to send the

Ryans' application to a Technical Services office even though the Ryans never submitted the

information that the IRS had requested and deemed necessary for the evaluation of their

application.

Accordingly, the Court DENIES Plaintiff's motion for summary judgment and GRANTS

Defendant's motion for summary judgment as to Count One.

### B. Count Two

In Count Two, Plaintiff argues that she is entitled to a refund of the Penalty because the

"IRS breached the implied covenant of good faith and fair dealing." FAC at 24. Specifically,

Plaintiff asserts that the installment agreement between the IRS and the Ryans was a "federal

contract" that "included the implied covenant of good faith and fair dealing," *id.* ¶ 120, and that the IRS breached the implied covenant of good faith and fair dealing by failing to grant the Ryans' lien subordination application because this failure prevented the Ryans' from being able to cure their default under the installment agreement. *Id.* ¶ 121.

The Court concludes that as a matter of law, Plaintiff cannot assert a cause of action for breach of an implied covenant of good faith and fair dealing based on the installment agreement between the Ryans and the IRS because installment agreements between taxpayers and the IRS are not contracts in the common law sense. The United States District Court for the Eastern District of Pennsylvania addressed this very issue in *United States v. Ullman*, 2002 WL 987998 (E.D. Pa. May 8, 2002). That court observed that "[i]n contrast to the legal concept of a binding contract, which requires consideration, an installment agreement [between the IRS and a taxpayer] operates pursuant to statute." *Id.* at *4 (citing I.R.C. § 6159). Specifically, I.R.C. § 6159 authorizes the IRS to enter into an installment agreement with a taxpayer if the IRS "determines that such agreement will facilitate full or partial collection of" the taxpayer's tax liability, and also lists the circumstances under which the IRS can unilaterally terminate or modify an installment agreement. Ultimately, the *Ullman* court concluded that an installment agreement entered into pursuant to I.R.C. § 6159 "is not a contract in the sense that breach of its terms gives rise to a common law breach of contract action because of the absence of consideration on the part of [the taxpayer]." *Ullman*, 2002 WL 987998, at *4. The Court of Federal Claims cited *Ullman* with approval in *Oppenheim v. United States*, 2009 WL 586118, at *6 (Ct. Fed. Cl. Mar. 6, 2009), and noted that *Ullman* "cast[ed] doubt on the propriety of characterizing installment agreements [between taxpayers and the IRS] as contracts or as being controlled by those principles." *Id.* at *7.

The Court finds the reasoning in *Ullman* persuasive. As a result, the Court declines to treat the installment agreement between the Ryans and the IRS as a common law contract that includes an implied covenant of good faith and fair dealing. Thus, Plaintiff's cause of action for breach of that implied covenant fails as a matter of law.

1    Further, the Court notes that even if Plaintiff could assert a cause of action for breach of an

2    implied covenant of good faith and fair dealing based on the installment agreement between the

3    Ryans and the IRS, Plaintiff has failed to present sufficient evidence to enable a reasonable trier of

4    fact to conclude that the IRS breached the implied covenant by failing to grant the Ryans' lien

5    subordination application.  Specifically, as discussed above, it is undisputed that the Ryans did not

6    comply with the IRS's request to provide additional information about the proposed $2 million

7    loan against their $4.5 million property—which, significantly, was information that the IRS had

8    deemed necessary for determining whether the IRS was even statutorily authorized under I.R.C. §

9    6325(d) to grant the Ryans' lien subordination application.  In light of the Ryans' undisputed

10   failure to provide this additional information to the IRS, the Court concludes that as a matter of

11   law, Plaintiff cannot demonstrate that the IRS's failure to approve the Ryans' application

12   amounted to bad faith or unfair dealing.

13   Further, also discussed above, the Court has already determined that Plaintiff has not

14   created a dispute of material fact as to whether the IRS, by failing to approve the Ryans' lien

15   subordination application, abused the considerable discretion it had pursuant to I.R.C. § 6325(d)

16   and 26 C.F.R. § 301.6325-1(d) to evaluate and resolve requests for lien subordination.  In

17   particular, the Court explained that (1) the IRS had to decide whether subordinating its lien over

18   *the Ryans' entire $4.5 million primary residence* in exchange for $2 million in loan proceeds was

19   likely to "ultimately result in an increase in the amount realized by the United States from the

20   property subject to the lien" 26 C.F.R. § 301.6325-1(d)(2); and (2) given this low loan-to-value

21   ratio, there is little reason to think, and Plaintiff offers no evidence or reasons to suggest, that it

22   would have been *outside the bounds of the IRS's discretion* to determine that rejecting the Ryans'

23   lien subordination application, and thereby maintaining the superior lien over the Ryans' primary

24   residence, would ultimately be the revenue-maximizing option.  Indeed, the fact that the IRS was

25   eventually able to extract $3.8 million of value out of the Ryans' primary residence as a result of

26   its superior lien over the property adds credence to the notion that rejecting the Ryans' lien

27                                                        24

28

subordination application would have been within its discretion. ECF No. 63 ¶ 35. For the very same reasons, the Court concludes that Plaintiff has not created a dispute of material fact as to whether the IRS acted in bad faith and engaged in unfair dealing by failing to approve the Ryans' lien subordination application.

Accordingly, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's motion for summary judgment as to Count Two.

## C. Count Four

In Count Four, Plaintiff asserts that she is entitled to a refund of the Penalty because the Ryans' failure to timely pay their taxes was "due to reasonable cause and not due to willful neglect." FAC ¶¶ 132–41; I.R.C. § 6651(a)(3). To review briefly, it is undisputed that the Penalty in the instant case was a "failure-to-pay" penalty that was imposed on the Ryans pursuant to I.R.C. § 6651(a)(3). *See* Pl. Mot. at 1; Def. Mot. at 14. Section 6651(a)(3) imposes a penalty on any taxpayer who fails "to pay any amount in respect of any tax required to be shown on a return . . . which is not so shown" within "10 business days" after the IRS issues a "notice and demand" for payment of the tax, if the tax demanded is greater than $100,000. Further, as the Court explained above, the penalty starts accruing 10 business days after the notice and demand is issued and grows according to monthly rates set forth in § 6651 until either the taxpayer pays the entire tax or the penalty reaches 25 percent of the entire tax, whichever comes first. In the instant case, the Ryans had until July 18, 2005—10 business days after the IRS issued a notice and demand for payment of taxes on July 4, 2005—to pay the IRS almost $14 million in taxes, exclusive of interest and accuracy-related penalties. *See* ECF No. 64-1, Exh. 219 at US-000017 ("07-04-2005 Statutory Notice of Balance Due" listed on the "Form 4340" "Certificate of Assessments, Payments, and Other Specified Matters" for "Kevin J & Nancy Ryan"); *E.J. Harrison*, 2011 WL 2636263, at *3 n.5 ("A Statutory Notice of Balance Due entry on Form 4340 is sufficient to presumptively establish that notice and demand was sent on the date corresponding to the Statutory Notice of Balance Due entry."); ECF No. 64-1 at US-000003 (listing taxes, interest, and

accuracy-related penalty assessed against the Ryans on July 4, 2005). The Ryans managed to pay only $3,175,000 to the IRS by July 18, 2005, and thus the Penalty started accruing on that date. *See* ECF No. 64-1 at US-000003.

A taxpayer can obtain an abatement of a penalty imposed under § 6651(a)(3). However, in order to obtain such an abatement, the taxpayer must meet the "heavy burden" of demonstrating that his failure to pay the tax within 10 business days of the IRS's notice and demand for payment was both (1) "due to reasonable cause"; and (2) not a result of "willful neglect." *United States v. Boyle*, 469 U.S. 241, 245 (1985); I.R.C. § 6651(a)(3). Neither "willful neglect" nor "reasonable cause" is defined by statute. However, the United States Supreme Court has stated that "willful neglect," as used in a related and nearby provision, § 6651(a)(1), "may be read as meaning a conscious, intentional failure or reckless indifference." *Boyle*, 469 U.S. at 245.

Further, the meaning of "reasonable cause" has been fleshed out in regulations and case law. Specifically, reasonable cause, as used in the subsections of § 6651(a), is defined by 26 C.F.R. § 301.6651-1(c)(1), which is "viewed very narrowly." *Conklin Bros. of Santa Rosa, Inc. v. United States*, 986 F.3d 315, 317 (9th Cir. 1993). That regulation states that a failure to timely pay a tax "will be considered due to reasonable cause to the extent that the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability." 26 C.F.R. § 301.6651-1(c)(1). The regulation further states that "consideration will be given to all the facts and circumstances of the taxpayer's financial situation," including "the amount and nature of the taxpayer's expenditures in light of the income (or other amounts) he could, at the time of such expenditures, reasonably expect to receive prior to the date prescribed for payment of the tax." *Id.* Thus, the regulation specifically warns that:

> [A] taxpayer who invests funds in speculative or illiquid assets has *not* exercised ordinary business care and prudence in providing for the payment of his tax liability *unless*, at the time of the investment, the remainder of the taxpayer's assets and estimated income will be sufficient to pay his tax or it can be reasonably foreseen that the speculative or illiquid investment made by the taxpayer can be utilized (by sale or as security for a loan) to realize sufficient funds to satisfy the tax liability. A taxpayer will be considered to have exercised ordinary business care and prudence

if he made reasonable efforts to conserve sufficient assets in marketable form to satisfy his tax liability and nevertheless was unable to pay all or a portion of the tax when it became due.

*Id.* (emphases added). As such, courts have viewed claims of reasonable cause with suspicion when the taxpayer's failure to pay stemmed from his involvement in speculative investments. For example, in *McLaine v. C.I.R.*, 138 T.C. 228 (2012), the United States Tax Court, in rejecting a petitioner's argument that he had reasonable cause for failing to pay a tax in time because he did not have enough liquid assets when the tax was due, stated that:

> Petitioner's illiquidity as of [the date on which the tax was due] was a problem of his own making. After his exercise of the 1999 NQOs, petitioner had the funds necessary to pay the taxes associated with his income from the 1999 exercise. The fact that he lost most of those funds by investing them in high technology stocks and ventures that ultimately failed (and did not retain sufficient funds to pay his 1999 tax) does not provide a basis for his claim of reasonable cause for his nonpayment or late payment of tax.

*Id.* at 247. Similarly, in *Schroer v. United States*, 594 F. Supp. 2d 1257 (D. Colo. 2009), the United States District Court for the District of Colorado held that "reliance on a speculative financial transaction like the sale of real property at a given price and time, when that transaction ultimately fails, does not constitute reasonable cause for the failure to pay taxes when due." *Id.* at 1269 (citing *In re Jacobs*, 490 F.3d 913, 927 (11th Cir. 2007), *Fran Corp. v. United States*, 164 F.3d 814, 819–20 (2d Cir. 1999), and *In re Hopkins*, 1991 WL 289179, at *2 (Bankr. D. Colo. Oct. 22, 1991)).

In the instant case, Plaintiff has failed to create a dispute of material fact as to whether the Ryans had reasonable cause for failing to timely pay their taxes. In attempting to satisfy her "heavy burden" of demonstrating reasonable cause, *Boyle*, 469 U.S. at 245, Plaintiff essentially bases her reasonable cause claim exclusively on the violations she asserted in Counts One and Two. That is, Plaintiff argues that the Ryans had reasonable cause for failing to pay their taxes on time because (1) the IRS abused its discretion by mishandling and ultimately failing to grant the Ryans' lien subordination application; and (2) the IRS breached a covenant of good faith and fair dealing implied in the installment agreement between the IRS and the Ryans. Pl. Mot. at 19–23;

27

*see also id.* at 25 (stating that the Ryans "would have paid the loan proceeds but for the IRS'[s] unexpected prevention of the loan closing. Imposition of the Penalty, in these circumstances, was fundamentally unfair"); Pl. Reply at 11 (stating that Plaintiff's "Count VI – Reasonable Cause, Count I – Abuse of Discretion, and Count II – Breach of Contract are interrelated and have been addressed together").

However, the Court has already determined that Defendant is entitled to judgment as a matter of law on Plaintiff's abuse of discretion and breach of good faith and fair dealing causes of action. Thus, because Plaintiff bases her reasonable cause claim in Count Four on those unsuccessful causes of action, it follows that Defendant is also entitled to judgment as a matter of law on Plaintiff's reasonable cause claim. This alone is sufficient grounds to grant summary judgment in favor of Defendant on Count Four.

Further, there are other significant problems with Plaintiff's reasonable cause claim. For example, the IRS's failure to approve the Ryans' lien subordination application—which the Ryans submitted to the IRS in January 2006—could not possibly have given the Ryans reasonable cause for failing to pay their taxes when they were due six months earlier on *July 18, 2005* (pursuant to I.R.C. § 6651(a)(3)). At the very most, the IRS's failure to approve the application could only provide reasonable cause for some of the Ryans' delay in paying taxes that were already overdue.

Additionally, although it is not Defendant's burden to show that the Ryans lacked reasonable cause for failing to pay their taxes on time, Defendant points to other undisputed facts that indicate that the Ryans' failure to timely pay their taxes was not due to reasonable cause. First, Defendant highlights the fact that in March and April of 2005, which was after the IRS had proposed to assess tax deficiency of approximately $14 million against the Ryans, *see* FAC ¶ 21, Mr. Ryan loaned a total of $3.6 million to LSBC, a company for which Mr. Ryan was serving as CEO at the time. ECF No. 64-5, Exh. 257 at 14. In 2005, LSBC was in financial trouble. Specifically, according to LSBC's Form 10-Q for "the quarterly period ended September 30, 2005," LSBC had "incurred negative operating cash flows of . . . $14,566,000 during the year

28

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ended December 31, 2004" and was in the midst of incurring an additional negative operating cash flow of $7,406,000 "during the first nine months of 2005." ECF No. 64-5, Exh. 257 at 10. Thus, LSBC's "history of negative cash flow" raised "substantial doubt about [its] ability to continue as a going concern." *Id.* at 13. LSBC never repaid Mr. Ryan's loan and declared bankruptcy in January 2006. ECF No. 64-5, Exh. 254; ECF No. 64-13 Exh. 270. Further, when Mr. Ryan loaned the $3.6 million to LSBC, the Ryans were also in the midst of negotiating an installment agreement with the IRS. *See* FAC ¶ 26. The Ryans had requested an installment agreement from the IRS as an alternative to paying the entire tax all at once, and had submitted a Form 433-A financial statement to the IRS disclosing assets that were insufficient to pay their entire tax liability in a single lump-sum payment. FAC ¶¶ 24–25.

In sum, despite being on notice of an impending multi-million dollar tax assessment against him and his wife, and despite representing to the IRS that he and his wife did not have enough money to pay that tax in a single payment, Mr. Ryan chose to lend $3.6 million to the company for which he was serving as CEO. Further, that company (1) was hemorrhaging money at the time; (2) had substantial doubts about its "ability to continue as a going concern," ECF No. 64-5, Exh. 257 at 13; and (3) ended up going under and never repaying Mr. Ryan any portion of the $3.6 million loan amount. In light of Mr. Ryan's decision to expend a substantial sum of money on what was essentially his own failing business enterprise instead of using that money to pay his tax obligations, Plaintiff's claim that the Ryans had reasonable cause for failing to pay their taxes on time is not well-taken. *See McLaine*, 138 T.C. at 247 ("The fact that [petitioner] lost most of those funds by investing them in high technology stocks and ventures that ultimately failed (and did not retain sufficient funds to pay his 1999 tax) does not provide a basis for his claim of reasonable cause for his nonpayment or late payment of tax."); *Schroer*, 594 F. Supp. 2d at 1269 ("[R]eliance on a speculative financial transaction like the sale of real property at a given price and time, when that transaction ultimately fails, does not constitute reasonable cause for the failure to pay taxes when due."). Plaintiff offers no evidence that suggests that by lending

United States District Court
Northern District of California

millions of dollars to LSBC in 2005, Mr. Ryan "exercised ordinary business care and prudence in providing for payment of his tax liability." 26 C.F.R. § 301.6651-1(c)(1). Indeed, although Plaintiff offers a declaration from Ronald Artale, who worked closely with Mr. Ryan as LSBC's Chief Operating Officer from 2003 to 2006, in support of her case, Mr. Artale states in his declaration that in 2005 LSBC "had approached numerous potential lenders without success and some potential lenders had suggested a willingness to invest but only under onerous terms." ECF No. 66-3 ¶ 8. Thus, statements from one of Plaintiff's own declarants demonstrate that Mr. Ryan's decision to loan $3.6 million to LSBC in 2005 was in fact a very risky investment—one that other lenders were willing to engage in only "under onerous terms." *Id.* Moreover, Mr. Ryan loaned an additional $750,000 to LSBC on August 5, 2005. ECF No. 64-5, Exh. 257 at 7. Then, on November 22, 2005, Mr. Ryan loaned another $340,000 to LSBC. ECF No. 64-5, Exh. 256.

Second, Defendant mentions the fact that on June 23, 2006, Mr. Ryan transferred legal title to the Ryans' third home in San Jose to his daughter and son-in-law, the McIlvains, in return for a promissory note that did not require any payments until September 2011. ECF No. 63 ¶ 30; *see Ryan*, 2011 WL 1344499 at *2. The Ryans did not disclose their ownership of this home, which was worth about $900,000 in 2006, during their installment agreement negotiations with the IRS in 2005. ECF No. 64-2, Exh. 229; ECF No. 64-3, Exhs. 230–31; ECF No. 64-11, Exh. 267 at 75; *see Ryan*, 2011 WL 1344499 at *2 (stating that the Ryans "concealed the 2006 transfer of real property to their daughter"). The Ryans could have sold this third home and applied the proceeds of the sale towards their tax liabilities. Instead, the Ryans concealed the home from the IRS and subsequently transferred title to the McIlvains before the IRS could issue a levy upon the property. *See Ryan*, 2011 WL 1344499 at *2 ("The IRS was unable to levy upon one parcel of real property owned by the Ryans at the time they incurred the tax liability because the Ryans transferred the property to their daughter in 2006 in return for a promissory note that does not require any payments until September 2011."). The Ryans' actions regarding their San Jose home go beyond mere lack of "ordinary business care and prudence in providing for payment of [their] tax

30

liability," 26 C.F.R. § 301.6651-1(c)(1), and suggest a calculated avoidance of tax obligations. Indeed, in approving the IRS's levy on the Ryans' principal residence, Judge Fogel cited the Ryan's "2006 transfer of real property to their daughter" as a reason why "the Ryans would not prevail" if "equitable considerations were to play a part in the Court's analysis" of whether to approve the IRS's levy. *Ryan*, 2011 WL 1344499 at *2. Similarly, in the instant case, in light of the Ryans' decision to conceal and transfer their San Jose home instead of selling it and applying the proceeds to their tax obligations, Plaintiff cannot demonstrate that the Ryans had reasonable cause for failing to pay their taxes on time.

Because Plaintiff has failed to create a dispute of material fact as to whether the Ryans had reasonable cause for failing to timely pay their taxes, she cannot prevail on her claim for an abatement of the Penalty pursuant to I.R.C. § 6651(a)(3). Accordingly, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's motion for summary judgment as to Count Four.

**D. Count Three**

In Count Three, Plaintiff argues that she is entitled to a refund of the Penalty because the IRS failed to comply with certain procedural requirements before assessing the Penalty. *See* FAC ¶¶ 123–31. Specifically, Plaintiff argues in her motion for summary judgment that the IRS (1) failed to send a notice and demand for payment of tax to the Ryans, which the IRS was required to do within 60 days after assessing the tax in order to assess the Penalty, I.R.C. §§ 6303(a) & 6651(a)(3); and (2) failed to issue a notice of deficiency to the Ryans, in accordance with the deficiency procedures set forth in I.R.C. §§ 6211–16, before assessing the Penalty. Pl. Mot. at 15–19.

However, the undisputed facts demonstrate that, under the applicable law, Plaintiff has failed to create a material dispute of fact as to whether the IRS violated any procedural requirements related to its assessment of the Penalty. First, as to notice and demand for payment of tax, Defendant's evidence indicates that the IRS issued such notice and demand to the Ryans on

United States District Court
Northern District of California

July 4, 2005. Specifically, Defendant has submitted a Form 4340 "Certificate of Assessments, Payments, and Other Specified Matters" for "Kevin J & Nancy Ryan" that contains an entry called "Statutory Notice of Balance Due" dated "07-04-2005." ECF No. 64-1, Exh. 219 at US-000017. The United States Tax Court has stated that "[a] Statutory Notice of Balance Due entry on Form 4340 is sufficient to presumptively establish that notice and demand was sent on the date corresponding to the Statutory Notice of Balance Due entry." *E.J. Harrison*, 2011 WL 2636263, at *3 n.5. Thus, the "Statutory Notice of Balance Due" entry on the Form 4340 in the instant case "presumptively establish[es]" that the IRS sent a notice and demand for payment of tax to the Ryans on July 4, 2005. *Id.* Further, Plaintiff has "failed to provide any credible evidence to rebut th[at] presumption." *Id.* Plaintiff only conclusorily asserts, without any citation to the record, that "[t]he IRS did not send or deliver to the Ryans the statutory Notice and Demand for payment of taxes required by I.R.C. [§] 6651(a)(3) before assessing the Penalty." Pl. Mot. at 18–19.

The undisputed facts also establish that the IRS issued its notice and demand in compliance with the timelines prescribed by I.R.C. §§ 6303(a) & 6651(a)(3). Section 6303(a) requires such notice and demand to be given "within 60 days[] after the making of an assessment of a tax." Here, the IRS assessed the relevant tax—almost $14 million, exclusive of interest and accuracy-related penalties—on July 4, 2005, ECF No. 64-1, Exh. 219 at US-000003, the same day it sent the notice and demand for payment of that tax to the Ryans. Further, § 6651(a)(3) instructs that a "failure-to-pay" penalty begins accruing 10 business days after notice and demand is issued, which clearly establishes that a notice and demand must be issued at least 10 business days before the IRS can assess a penalty under § 6651(a)(3). Here, the IRS assessed the Penalty on October 1, 2007, more than two years after it sent the notice and demand for payment of tax to the Ryans. ECF No. 64-1, Exh. 219 at US-000007.

Second, as to deficiency procedures, although Defendant concedes that "no notice of deficiency was issued to the Ryans prior to assessment of the Penalty," Def. Opp. at 5, Defendant also correctly points out that the IRS was not required to issue a notice of deficiency in order to

32

collect the Penalty. It is well-established that penalties under § 6651(a)(3) "may be collected by [the IRS] by notice and demand . . . and *without recourse to the deficiency procedures*," including the deficiency notice requirement set forth in § 6212. *Reese v. C.I.R.*, 2006 WL 314422, at *5 (T.C. Feb. 9, 2006) (emphasis added). This is because § 6651(a)(3) penalties "are not attributable to a deficiency." *Id.* Instead, they "are attributable to amounts that have already been assessed but remain unpaid." *Id.* In other words, so long as the IRS issues a notice and demand for payment of a tax—which, as explained above, it did in the instant case—the IRS may collect a § 6651(a)(3) penalty for failure to timely pay that tax without issuing a notice of deficiency or complying with any other deficiency procedures. *See also Kimball v. C.I.R*, 2008 WL 862339, at *7 (T.C. Apr. 1, 2008) ("Section 6651(a)(3) additions are attributable to amounts that have already been assessed but remain unpaid, and therefore the Commissioner may collect such additions by notice and demand without assessment and without recourse to the deficiency procedures."); *Stone v. C.I.R.*, 2005 WL 3501581, at *4 (T.C. Dec. 22, 2005) ("Since the section 6651(a)(3) addition follows from the failure to pay an amount after notice and demand, it is not subject to the deficiency procedures.").

Accordingly, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's motion for summary judgment as to Count Three.

### E. Count Five

In Count Five, Plaintiff argues that she is entitled to a refund of the Penalty because the closing agreement between the Ryans and IRS "barred the IRS from imposing the Penalty." FAC at 27. As discussed above, after the IRS audited the Ryans' 2000 tax return and determined that the Ryans had bought a "Son of Boss" tax shelter, the IRS proposed to (1) assert a deficiency in tax of almost $14 million by disallowing more than $36 million in losses from the tax shelter; and (2) add a 40% accuracy-related penalty under I.R.C. § 6662. *See* FAC ¶¶ 21, 142. In order to resolve the tax dispute without litigation and "avoid" the "threatened imposition of a 40% [accuracy-related] penalty," the Ryans elected to participate in a settlement initiative with the IRS.

*Id.* ¶¶ 21, 23; ECF No. 64-2, Exhs. 224–25. As a result of the settlement initiative, the IRS and the Ryans entered into a closing agreement in which, inter alia, the IRS (1) disallowed a total of $36,383,476.00 in losses for the year 2000; (2) agreed to allow the Ryans to deduct half of their out-of-pocket costs from the "Son of Boss" transaction; and (3) agreed to limit the accuracy-related penalty under I.R.C. § 6662 to 10%. ECF No. 64-2, Exh. 228 ¶¶ 2, 3, 8.

Plaintiff argues that because the closing agreement "was a comprehensive settlement agreement" with a "broad and all-inclusive scope," the fact that the agreement specifically addressed only one type of penalty—the 10% accuracy-related penalty under I.R.C. § 6662—means that the IRS "agreed to settle," and thereby "explicitly waived its claim to assert," all other "penalties ('additions to tax') applicable to the transaction," including any "failure-to-pay" penalty under I.R.C. § 6651(a)(3). Pl. Mot. at 12; FAC ¶¶ 144–45.

However, under the applicable law, the closing agreement's silence as to § 6651(a)(3) penalties did not bar the IRS from assessing the Penalty in the instant case. Closing agreements between taxpayers and the IRS are authorized and governed by I.R.C. § 7121. Further, contrary to Plaintiff's insistence that the closing agreement was a "broad," "all-inclusive," and "comprehensive settlement agreement," the United States Tax Court has stated that the parties to a § 7121 closing agreement—like the one in the instant case—"are bound only as [to] the specific matters agreed upon" in the closing agreement. *Magarian v. C.I.R.*, 97 T.C. 1, 5–6 (1991) (citing *Zaentz v. C.I.R.*, 90 T.C. 49, 761–72 (1988)). This is further reinforced by the fact that the specific type of closing agreement in the instant case was a "Form 906," which is titled "Closing Agreement on Final Determination *Covering Specific Matters*," ECF No. 64-2, Exh. 228 (emphasis added), and is therefore "used with respect to the closing of *specific* matters affecting tax liability." *Magarian*, 97 T.C. at 5 (emphasis added). Thus, because penalties under I.R.C. § 6651(a)(3) were not among the specific matters agreed upon in the closing agreement, the IRS was not "bound" by the closing agreement with respect to § 6651(a)(3) penalties in any way, and cannot be deemed to have "waived its claim to assert" a § 6651(a)(3) penalty based solely upon

34

the closing agreement's resolution of another type of penalty. Indeed, "as a general rule[,] closing agreements do not relate to additions to tax," including § 6651(a)(3) penalties. *Magarian*, 97 T.C. at 6. Here, the mere fact that the closing agreement addressed another type of addition to tax is not enough to rebut this "general rule." *Id.* Instead, if the Ryans "had intended to settle with respect to any of the [other] possible additions to tax for the taxable year [2000], they should have insisted upon the inclusion of specific language to that effect in the [c]losing [a]greement." *Id.* at 6–7. "Without such language, . . . the specific matters agreed upon by the parties must be respected." *Id.* at 7 (concluding that a closing agreement did not bar the IRS from assessing additions to tax that were not mentioned in the closing agreement).

Further, even if it was appropriate to consider extrinsic evidence to determine the scope of the closing agreement, such evidence would not benefit Plaintiff. Plaintiff relies on the installment agreement, but nothing about the installment agreement indicates that the IRS waived its ability to collect a failure-to-pay penalty under § 6651(a)(3) by signing the closing agreement. Indeed, the I.R.C. contemplates that § 6651(a)(3) penalties will accrue even when an installment agreement is in effect. Specifically, I.R.C. § 6651(h) states that if an installment agreement is in effect while a penalty under any of the subsections of § 6651(a) is accruing, the growth rate of the penalty must be decreased to 0.25 percent of the outstanding tax liability per month. Further, in the instant case, the installment agreement between the IRS and the Ryans expressly allowed for the recovery of "PENALTIES AND INTEREST PROVIDED BY LAW" in addition to the $17,488,221.95 balance due. ECF No. 64-3, Exh. 232. Because that $17,488,221.95 balance included the 10 percent accuracy-related penalty (along with almost $14 million in taxes, plus interest on those taxes), the installment agreement's reference to "PENALTIES" implies that the IRS did not waive its ability to assess a § 6651(a)(3) penalty against the Ryans. At the very least, the installment agreement does not help Plaintiff create a dispute of material fact about whether the closing agreement affirmatively barred the IRS from assessing a § 6651(a)(3) penalty against the Ryans.

Case No. 16-CV-00164-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

Accordingly, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's motion for summary judgment as to Count Five.

### F. Count Six

In Count Six, Plaintiff argues that she is entitled to a refund of the Penalty because the IRS should grant a "first-time abatement" of the Penalty "pursuant to the Internal Revenue Manual." FAC ¶¶ 146–54. Plaintiff appears to be referring to I.R.M. 20.1.1.3.3.2.1, which is an "administrative waiver" that allows the IRS to provide "administrative relief" from certain penalties, including penalties under § 6651(a)(3), if the taxpayer meets certain eligibility criteria. However, the IRS asserts that it has "absolute discretion to grant or deny a request" for a first-time-abatement under I.R.M. 20.1.1.3.3.2.1. Def. Mot. at 23. Further, and in any event, the IRS correctly points out that Plaintiff's claim for a first-time abatement pursuant to the Internal Revenue Manual cannot prevail because "[t]he Internal Revenue Manual does not have the force of law and does not confer rights on taxpayers." *Fargo v. Comm'r*, 447 F.3d 706, 713 (9th Cir. 2006). Perhaps in recognition of this fact, Plaintiff does not oppose Defendant's motion for summary judgment as to Count Six. Accordingly, the Court GRANTS the Defendant's motion for summary judgment as to Count Six.

### G. Count Seven

In Count Seven, Plaintiff argues that she is entitled to a refund of the Penalty because the Form 872-I that the taxpayers signed on March 24, 2004 barred the IRS from assessing the Penalty. FAC ¶¶ 155–61; *see* ECF No. 64-1, Exh. 223. When the IRS selected the Ryans' 2000 tax return for an audit in March 2004, *see* FAC ¶ 17; ECF No. 64-2, Exh. 226, the end of the three-year limitations period for the IRS to assess taxes related to that return, which is set forth in I.R.C. § 6501(a), was approaching. *See* I.R.C. § 6501(a) (stating that "the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed"). Thus, the IRS asked the Ryans to sign a Form 872-I, titled "Consent to Extend the Time to Assess Tax as well as Tax Attributable to Items of a Partnership," which extended the IRS's deadline to assess taxes

related to the 2000 tax return to December 31, 2005. ECF No. 64-1, Exh. 223. The parties were authorized by I.R.C. § 6501(c)(4) to agree to this extension of the § 6501(a) limitations period. *See* I.R.C. § 6501(c)(4) ("Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title . . . both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon."). Plaintiff asserts that the Penalty, which was imposed on October 1, 2007, was "untimely and invalid" because it was assessed "well beyond the extended assessment deadline (December 31, 2005)" that the Ryans agreed to in the Form 872-I. Pl. Mot. at 19.

Plaintiff's argument is unavailing, however, because as a matter of law, the Penalty was not subject to the extended assessment deadline set forth in the Form 872-I. It is well-established that I.R.C. § 6501(a), which, as discussed above, establishes a three-year limitations period for the assessment of taxes, does not apply to the assessment of "failure-to-pay" penalties under § 6651(a)(3). As the IRS correctly points out, "[e]very court to consider the issue" has held that § 6651(a)(3) penalties are not subject to the statute of limitations in § 6501(a). Def. Mot. at 24; *United States v. Lund*, 2012 WL 3779105, at *1 (D. Ore. Aug. 31, 2012) (stating that "every court to consider the issue has held that § 6651(a)(3) creates an exception to the three year statute of limitations" in § 6501(a)); *Bob Hamric Chevrolet, Inc. v. U.S. I.R.S.*, 849 F. Supp. 500, 515 (W.D. Tex. 1994) (finding that a § 6651(a)(3) penalty based on a 1983 tax return was timely even though it was assessed in 1991); *United States v. Krasnow*, 548 F. Supp. 686 (S.D.N.Y. 1982) (holding that § 6651(a)(3) penalties are not subject to the limitations period set forth in § 6501(a)); *see also In re Gurley*, 335 B.R. 389, 393 (Bankr. W.D. Tenn. 2005) (stating that "[t]he IRS correctly points out in its memorandum that the limitations period set out at § 6501(a) does not apply to [a] failure to pay penalty" under § 6651(a)(2)). Further, the Form 872-I that the Ryans signed was merely an agreement, authorized under § 6501(c)(4), to extend the IRS's tax assessment deadline beyond the default limitations period set by § 6501(a). Thus, there is little reason to think, and Plaintiff

provides no factual or legal basis to suggest, that the extended December 31, 2005 deadline was somehow applicable to the Penalty even though the original deadline was not. As a result, the October 1, 2007 Penalty was not barred by the December 31, 2005 deadline set forth in the Form 872-I.

Accordingly, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's motion for summary judgment as to Count Seven.

## IV.     CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: April 12, 2018

_Lucy H. Koh_
LUCY H. KOH
United States District Judge